IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2020

**IN RE ALLIE-MAE K., ET AL.**

**Appeal from the Juvenile Court for Hickman County**
**No. 19-JV-169        Amy Cook Puckett, Judge**

_____

**No. M2020-00215-COA-R3-PT**

_____

This appeal involves the termination of a mother's parental rights. The trial court found by clear and convincing evidence that multiple grounds for termination were proven and that termination is in the best interest of the children. We reverse one ground for termination but otherwise affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part, Affirmed in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S. joined and KRISTI M. DAVIS, J., filed a separate concurrence and partial dissent.

Richard Boehms, Hohenwald, Tennessee, for the appellant, Katelyn C.

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Thomas H. Miller, Franklin, Tennessee, guardian ad litem.

**OPINION**

## I.    FACTS & PROCEDURAL HISTORY

The three young children at issue in this case were removed from the home of Katelyn ("Mother") and Ricky ("Father") in August 2018.[1] Child Protective Services had become involved with the family due to the parents' drug usage and arrests, and there were

---

[1] We refer to the parties in this manner to protect the privacy of the children.

additional concerns of environmental neglect and lack of supervision. Father was incarcerated, and Mother admitted to using meth while being a caretaker for the children. The children were briefly placed in the home of relatives for a matter of days, but when they could no longer care for them, the children "came into" the custody of the Department of Children's Services on August 23. The children were placed in a foster home that same day. DCS filed a petition for dependency and neglect the following day.

The children were ages five, two, and almost eleven months when they entered foster care. The children had head lice and hundreds of bug bites. Their belongings had to be discarded because they were covered in rat feces and urine. The youngest child was very sick with a respiratory infection, and he did not crawl, walk, or communicate verbally. The two-year-old girl "cussed a lot" and would lash out, hit, and throw things. The five-year-old could not identify any letters, numbers, or colors. At her first meeting with her DCS caseworker, Daphne Baer, the oldest child reported that her parents "have to take medication every day and that she sees them put needles in their arms sometimes and that seems to make them feel better because they laugh a lot then."

After some difficulty locating the parents, Ms. Baer met with them in September 2018. Both parents failed drug screens, testing positive for meth and several other substances. According to Ms. Baer, Father would not allow Mother to speak and "shut her down when she tried to talk." Ms. Baer noted that Mother "appeared to be high," as she was distracted during the meeting and could not concentrate or be still. Father told the caseworker that he had been taking care of Mother (age 23) since she was 16 and that she was "not right."

A permanency plan was developed on September 18, 2018. Ms. Baer provided transportation for the parents to and from the meeting. The plan listed dual goals of return to parent or adoption. It set a goal target date six months later, on March 18, 2019. The parents had lived in a mobile home at the time of removal but had since lost that home and moved into a very small camper next to the home of Mother's mother. The permanency plan required them to obtain housing with utilities. They were required to apply at the local housing authority and other low-income apartments in the area. The plan also required them to participate in "home maker services" to learn how to keep their home clean and organized and safe for the children. Neither parent had a driver's license, and they were required to obtain a reliable means of transportation. Ms. Baer offered to drive the parents to any appointments.

The parents reported using meth for the past five years. Regarding drug use, the plan required the parents to participate in an alcohol and drug assessment and follow all recommendations to completion. The plan required the parents to submit to and pass random drug screens and also pill counts if prescribed medications. They were required to "make good peer choices" and avoid persons using or selling illegal substances. The parents were also required to resolve their current legal charges and refrain from incurring

any additional legal charges. Mother was on probation for simple possession of meth and was directed to comply with all rules of her probation.

Both parents reported that they had "mental health issues" that were not currently being treated. Therefore, the plan required them to complete a mental health intake and follow its recommendations. Finally, the parents were required to visit the children regularly to maintain their bond with them. The parents were allowed eight hours per month of therapeutic supervised visitation. They were directed to bring snacks and diapers to the visits and interact appropriately with the children. They would have supervised phone calls with the children twice weekly. Father indicated that he had difficulty with reading and writing, so Ms. Baer went over the requirements verbally multiple times. She also made separate lists and assisted with making appointments.

Shortly after the development of the permanency plan, in October 2018, the juvenile court entered an order adjudicating the children dependent and neglected due to environmental neglect and parental drug abuse. The children were to remain in the temporary legal custody of DCS. Ms. Baer transported the parents to court that day, and both parents refused drug screens but admitted they would test positive for meth and other substances. Ms. Baer assisted Mother and Father in completing alcohol and drug assessment intake calls, by phone, with a facility called Buffalo Valley Treatment Center. The provider determined that they needed inpatient treatment. Neither Mother nor Father had identification, so they were required to obtain that prior to entering the program, which led to some delay. However, Mother and Father separately attended thirty-day inpatient rehabilitation programs that spanned from mid-November to mid-December 2018.

Mother completed her program about three days before Father. Mother left the program with bipolar medication, and her discharge treatment plan recommended that she go to a transitional living program or halfway house. Mother initially agreed to go to a halfway house. However, on the day of her interview with the facility, she changed her mind and went back to live with her mother, who also has a serious drug problem. The alternative discharge plan was for Mother to get a job within two weeks, attend Narcotics Anonymous meetings three times per week, and attend mental health counseling. Sadly, however, Mother relapsed almost immediately. She started using drugs again in the three-day period before Father was even released from rehab. Ms. Baer assisted Mother with setting up a mental health appointment and transportation. However, Mother attended only one mental health appointment and had her prescribed medication filled for one month. Father stayed clean for about two weeks after he left rehab, but he also declined to enter a transitional living facility and relapsed on meth. Ms. Baer tried on multiple occasions to get Mother and Father to return for additional residential treatment, but they refused.

In March 2019, Mother and her mother had an argument regarding a food stamp card, which led to the grandmother hitting Mother and forcing her to leave her property. Mother and Father stayed with friends in Nashville for a short time and planned to get an

apartment there, but they were unsuccessful.

A revised permanency plan was developed on March 21, 2019. Again, Ms. Baer transported the parents to the meeting. Mother passed a drug screen, but Father tested positive for methamphetamine and marijuana, and Mother was upset that he had used without her. The parents still did not have appropriate housing, they had not followed their drug treatment discharge plans, they had continued to test positive for meth, and Mother was not taking her mental health medication. DCS added a requirement for addressing family violence concerns. The revised plan also noted concerns regarding the parents canceling visits with the children and not bringing diapers or food when they did attend. Both parents had tested positive for meth at the most recent visit. Mother and Father agreed to attend outpatient treatment, but the facility determined that they were not candidates for outpatient treatment and that both needed residential rehabilitation. Again, both parents refused residential treatment. According to Ms. Baer, Father said he would "starve to death" if he returned to rehab, and Mother simply said, "I'm not going."

In mid-April, a decision was made to restrict the parents' visits due to them consistently failing drug screens for meth, attending visits under the influence, and not taking advantage of their visitation most of the time. The parents were required to pass drug screens before visits.

On May 21, 2019, the guardian ad litem for the children filed a petition to terminate the parental rights of both parents. DCS was named as a party because it was the temporary legal custodian of the children. As grounds for termination, the petition alleged abandonment by failure to visit and/or support, substantial noncompliance with the permanency plans, persistent conditions, and failure to manifest a willingness and ability to assume custody or financial responsibility. The petition also alleged that termination was in the best interest of the children. Inexplicably, a hearing was held in the termination case on the same day the petition was filed, and the summonses state that Mother and Father were "served in court." The trial court entered an order stating that a hearing was held on May 21 and that "Parents were personally served w/ GAL's Petition today and appointed counsel."

In June 2019, Father attacked Mother after someone broke into their camper. He strangled her with a string from a "hoodie," which left a visible scar on her neck four to five inches long. He also hit her so hard that it ruptured her eardrum, and she suffered a concussion. Mother was hospitalized for a week as a result. Father was arrested and charged with aggravated assault, and he pled guilty to domestic assault. A bond condition was put in place prohibiting contact between Mother and Father, but they continued to live together.

On July 9, 2019, the guardian ad litem filed a motion for default judgment because neither parent had filed an answer to the May 21 petition. The trial court held a hearing on

- 4 -

July 16, and Mother was present at the hearing with her appointed counsel. We do not have a transcript of the hearing, but according to Ms. Baer, she and Mother's attorney approached Mother about going to a shelter because they were concerned for her safety. Ms. Baer offered to drive Mother there that same day. However, Mother defended Father, who was sitting nearby and telling her not to speak to them. According to Ms. Baer, Mother became very upset and angry at her attorney and made it known that she did not want him to be her attorney anymore. According to Ms. Baer, Mother "left the courtroom." The trial court's written order states that Mother's counsel asked to withdraw, and his request was granted. The order appointed new counsel for Mother and gave Mother ten additional days to file an answer. According to Ms. Baer, Father met with his attorney that day to formulate an answer, but Mother did not. Father's counsel filed Father's answer that same day.

On August 8, the guardian ad litem filed a second motion for default judgment as to Mother because she still had not filed an answer.[2] The trial court held another hearing on September 3, which Mother's new attorney attended, but Mother did not. The trial court entered an "Agreed Order" granting the motion for default judgment against Mother, stating that she had not responded to the termination petition "[t]hrough no fault of her attorney." The order provided that Mother would "not be allowed to present a defense at trial."

On August 26, 2019, a "Probation Revocation Order" was entered stating that Mother had violated her probation. Ms. Baer believed that this was due to nonpayment of child support. Mother was incarcerated for a short time.

On September 23, 2019, Ms. Baer went to the parents' camper to pick them up for another child and family team meeting for revision of the permanency plan. The camper had been moved and appeared to be ready to move off the property. Someone had broken the front door and most of the windows. Mother and Father were lying in bed inside the camper and would not get up. They talked with Ms. Baer through the window but refused to go with her to the meeting. The permanency plan was revised without the participation of Mother and Father. Around this time, Mother's mother sold her property, and the parents told Ms. Baer that they intended to move their camper to a nearby campground.

The termination trial was held on December 6, 2019. Mother was in attendance with her attorney. Mother's attorney cross-examined the witnesses, but Mother did not call any witnesses or introduce any exhibits. Most of the testimony came from Ms. Baer. She testified that she had been the family's caseworker from the day the children entered foster care in August 2018 until she transferred the case in late October 2019, five weeks before

---

[2] Ms. Baer's notes reflect that she went to the home on August 16 and asked Mother if she would call her new attorney but Mother stated that she did not want to talk to him and would do it later. Ms. Baer discussed with Mother that she only had a short period of time to file an answer.

trial. Ms. Baer had worked with over 1,200 families during her career at DCS and said that she does not like to "give up on people." However, she did not know of anything else that she could have offered to help Mother and Father. She explained that parents have to meet her halfway and that she "could not force them to do what they needed to do." Ms. Baer said Mother and Father both knew that "anywhere they needed to go, if I had the ability to take them that I would do so." Ms. Baer had driven Mother and Father places on several occasions, even taking them to a grocery store before a visit to get a birthday cake for the youngest child. She had bought food for Mother and Father a couple of times and also brought toiletries to them when they didn't have any. She went to their camper and allowed the parents to use her phone to make calls to schedule transportation and to make other necessary appointments.

Ms. Baer testified that the camper where the parents lived throughout her time as the family service worker was very small, measuring approximately six feet by ten feet. It had no running water, but the parents had put a pump in a nearby creek and ran a hose to pump water to the site. A year before trial, the electricity connection to the camper was cut off, and Ms. Baer was not aware of it ever being reconnected. She said the parents often built fires outside.

Mother and Father had both completed a mental health intake. However, neither followed up with therapy and counseling afterward. According to Ms. Baer, she offered to drive them to appointments, but the parents always had excuses as to why they were unable to attend. They did some sporadic sessions with homemaker services with a provider who went to their home, but they did not complete them. On almost every drug screen, Mother and Father either tested positive for meth or admitted that they would test positive and that there was no need to "waste a screen." Ms. Baer said that both parents were very candid about using meth as often as they could afford it. Although Mother had passed two drug screens, both reported that they were simply unable to stop using meth. Ms. Baer believed that they needed treatment in a long-term meth program of at least six months or possibly one year. Ms. Baer said that on multiple occasions she suggested longer term rehabilitation options and told the parents that these options were available free of charge, but neither parent would agree to go back. Ms. Baer said the parents admitted that being around the same people in Hickman County was a trigger for them to use, and the parents wanted to relocate but simply did not have the means to do so. Ms. Baer said she suggested other housing options for them and explained that a transitional living facility could help them escape from their environment. However, the parents would not agree to residential treatment because they would have to be separated, and they "could just never get it together" to move anywhere else. Ms. Baer had transferred the case to a different caseworker shortly before trial, so she was unsure as to whether Mother and Father had moved their camper to the campground as they planned.

Aside from the housing and drug issues, Ms. Baer testified that another barrier for the family was the fact that Mother would not commit to getting a job. Ms. Baer offered

to take Mother to a career center to put in applications, but Father said she had never worked and that he did not think Mother "would" work. Father believed that Mother should be receiving a disability check, like he did, because she had "issues." Ms. Baer said that she discussed jobs with Mother and that Mother "put in an application or two" but never got any calls. When asked if she believed Mother was capable of working, Ms. Baer admitted that Mother had "mental health issues" but believed that she could work if she took the proper medication. Father was receiving disability payments, but they were under the control of a conservator, and he did not receive the full amount of his checks. He admittedly worked at a scrapyard to make money to fund their drug habit.

Mother and Father were allowed eight hours per month of supervised visitation, but Ms. Baer testified that they never once exercised even five hours per month. Their last visit had occurred in February 2019, prior to the restriction on their visitation and the filing of the termination petition. Thus, they had not seen the children in approximately nine months by the time of trial.

Ms. Baer testified that the children were making great progress in their foster home. She described how the oldest child did not know any letters, numbers, or colors when she started kindergarten shortly after entering DCS custody, and the school system told her that they very rarely encounter a child who does not know some of those. The child was doing well "catching up" but was having some issues focusing and with anger. Doctors were not sure if she was suffering from ADHD or if her symptoms were due to the trauma she had experienced. She was attending therapy four times per week. The younger two were doing well aside from a few issues with slight aggression for the youngest. Ms. Baer believed that returning the children to the parents at this point would absolutely be harmful, adding, "they have difficulty taking care of themselves much less taking care of some children."

The children's foster mother testified as well. The children had been residing with her for over a year. Their current ages were six, three, and two. She testified that Mother and Father had not called the children in several months. The children referred to the foster mother as "Mom," and the oldest had asked the foster mother to adopt her. The foster mother had two older biological children in the home as well, whom the children considered to be their brother and sister.

The new family service worker recently assigned to the case testified as well. However, she had only met the children and Father (while he was incarcerated). She had not yet met Mother and explained that she would have met both parents at the child and family team meeting if they had not refused to come.

Despite the entry of the default judgment against Mother, at the close of the proof presented by the guardian ad litem, the trial court asked if there was any additional proof to be presented, and Mother's counsel and Father's counsel both indicated that their clients did not wish to testify. On January 7, 2020, the trial court entered an order terminating the

parental rights of both parents. (Father did not appeal the termination of his parental rights.) As for Mother, the trial court found that the guardian ad litem had sufficiently proven the grounds of abandonment by failure to visit and failure to support; substantial noncompliance with the permanency plans; persistent conditions; and failure to manifest an ability and willingness to assume custody or financial responsibility of the children. The trial court also found by clear and convincing evidence that termination was in the best interest of the children. Mother timely filed a notice of appeal.

## II. ISSUES PRESENTED

Mother presents a single issue for review on appeal: "Did the trial court err in finding grounds to terminate the mother's parental rights?" Although Mother's brief does not challenge the trial court's ruling on best interest, we must review the trial court's finding as to that issue as well. *See In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016) (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal").

## III. STANDARDS APPLICABLE TO TERMINATION CASES

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.*

Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual

finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## III.  DISCUSSION[3]

### A.  *Grounds for Termination*

### 1.  Abandonment

Tennessee Code Annotated section 36-1-113(g)(1) provides that one ground for termination of parental rights exists if "[a]bandonment" has occurred within the meaning of Tennessee Code Annotated section 36-1-102. The petition to terminate Mother's parental rights was filed on May 21, 2019. At that time, section 36-1-102 defined abandonment as occurring when, for a period of four consecutive months immediately

---

[3] At the outset, we note that Mother does not raise any issue regarding the entry of the default judgment against her or the procedure employed by the trial court. "Default judgments are allowed in termination cases." *In re B.G.J.*, 215 S.W.3d 396, 398 (Tenn. Ct. App. 2006). Tennessee Code Annotated section 36-1-117(n) provides:

> The court may enter a default judgment against any party to the adoption or termination proceeding upon a finding that service of process has been validly made against that party in accordance with the Tennessee Rules of Civil or Juvenile Procedure and the statutes concerning substituted service; however, in termination proceedings, *proof must be presented as to legal grounds and best interest* pursuant to § 36-1-113.

(emphasis added). As this Court recently explained in *In re Connor B.*, 603 S.W.3d 773, 783 (Tenn. Ct. App. 2020):

> A default judgment in a parental termination case, therefore, differs from a default judgment in other civil cases, wherein the typical civil defendant, "by suffering a default judgment to be entered against him, impliedly confesses all of the material allegations of fact contained in his complaint, except the amount of the plaintiff's unliquidated damages." *Patterson v. Rockwell Int'l*, 665 S.W.2d 96, 101 (Tenn. 1984). By contrast, a default judgment in a parental termination case requires the presentation of proof concerning grounds for termination of parental rights and best interest. *See In re Savanna I.*, No. E2018-00392-COA-R3-PT, 2018 WL 6167386, at *6 (Tenn. Ct. App. Nov. 26, 2018) (affirming the trial court's grant of a default judgment against the respondent mother, following the presentation of sufficient proof of grounds and best interest during an evidentiary hearing, based on her failure to answer the termination petition or otherwise defend the action).

preceding the filing of a petition to terminate parental rights, the parent "either ha[s] failed to visit or ha[s] failed to support or ha[s] failed to make reasonable payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(A)(i). Simply put, "abandonment can occur when a parent [] failed to visit or support a child for a period of four consecutive months immediately before the filing of a petition to terminate parental rights." *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at \*4 (Tenn. Ct. App. July 22, 2020).

Here, the guardian ad litem alleged, and the trial court found, abandonment by failure to visit and failure to support. We address each finding in turn.

### a. Failure to Visit

For purposes of this ground, a parent has "failed to visit" if he or she has failed "for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). "[T]oken visitation" means visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).[4]

Because the petition to terminate Mother's parental rights was filed on May 21, 2019, the relevant four-month period spans from January 21 through May 20, 2019. Mother was permitted eight hours of supervised visitation per month, but Ms. Baer testified that Mother never once exercised eight hours of visitation per month throughout the duration of the case. In fact, she testified that Mother never fulfilled even five hours per month. Visits were scheduled on various weekdays after school from 4:45 until 7:30. The provider that supervised the visits would contact the parents directly to schedule the dates of visitation. Ms. Baer said she assisted the provider when there were problems scheduling visits by "tracking down the parents." Ms. Baer also transported the parents to the visits on occasion.

Ms. Baer testified that Mother attended only two visits during the relevant four-

---

[4] "On July 1, 2018, the Tennessee General Assembly amended Tennessee Code Annotated section 36-1-102(1)(A) to remove the element of willfulness from the definition of abandonment by failure to support or visit." *In re Imerald W.*, No. W2019-00490-COA-R3-PT, 2020 WL 504991, at \*3 (Tenn. Ct. App. Jan. 31, 2020). It is now "a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful." Tenn. Code Ann. § 36-1-102(1)(I). However, "[t]he absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure." *Id.* The parent bears "the burden of proof that the failure to visit or support was not willful," and "[s]uch defense must be established by a preponderance of evidence." *Id.* Thus, "[u]nder the current version of the statute, the parent or guardian must raise, and bears the burden of proof on, the defense of 'absence of willfulness.'" *In re Raeshad B.*, No. M2018-00238-COA-R3-PT, 2019 WL 2172796, at \*6 n.1 (Tenn. Ct. App. May 20, 2019). Here, Mother did not file an answer or otherwise assert the absence of willfulness as a defense.

month period. On January 24, 2019, Mother's mother drove her to a visit, and they stayed only a little over an hour. The visit was supposed to last two hours forty-five minutes. Ms. Baer testified that during this visit, Father was crying and upset and having a very bad day, and the parents engaged with the children somewhat but not consistently. The parents left because Mother's mother was not feeling well. Ms. Baer testified that Mother often had different excuses as to why she had to leave visits early, such as it was getting late, it was getting dark, it was getting cold, or she or her mother did not feel well.

The next visit was scheduled for January 30, but Mother and Father never showed up. Mother called and reported that they had a flat tire and were only ten minutes away. However, when someone offered to come pick them up and bring them to the visit, they declined, stating that they needed to get back home. Ms. Baer testified that the children were waiting and were upset when the parents did not show up.

The second and final visit occurred on February 21. Ms. Baer said this visit "did not go well at all." Mother was nauseous and kept going outside to get medicine and fresh air. Ms. Baer said that Mother was wanting everyone to feel her stomach because she thought she might be expecting another baby, then Mother remarked, "If I am pregnant, I hope this baby is nothing like [the oldest child]." The child heard this remark, and Mother was directed to refrain from saying such things in front of the children. The child later became very upset. Both parents tested positive for meth that day. Mother additionally tested positive for marijuana, and Mother and Father had an argument about why she had not shared the drug with Father. This visit also ended early and was "[s]ignificantly shorter" than the two hours and forty-five minutes originally scheduled.

Mother canceled a visit on March 11 because she was in Nashville. She sent a text message stating that it was "killing" her not to see the children, "[b]ut," she added, "we're not going to be able to make it like always. I'm really sorry and tired of having to say this to my kids." When the permanency plan was revised on March 21, 2019, one topic of discussion was the parents' pattern of canceling visits and not bringing food or diapers when they did attend. The parents scheduled a visit on May 16, but when that day arrived, no visit occurred. Ms. Baer testified that she was unable to locate the parents or reach them by phone. The petition was filed on May 21. Although the date is not clear from the record, at some point, Mother's visitation was restricted such that she was required to pass a drug screen before visits due to her being under the influence of meth during visits and making inappropriate remarks to the children. It was later suspended until she could pass three consecutive drug screens. Ms. Baer testified that Mother never requested an increase or reinstatement of her visitation.

The trial court found that Mother "failed to visit beyond token visitation" during the relevant four-month period. It found that she had "come nowhere near close to doing [her] part to maintain contact or a relationship with the children." On appeal, Mother argues that two visits during the relevant four-month period should not be deemed token visitation.

"'Whether visitation is 'token' . . . is a fact-intensive inquiry to be decided on a case-by-case basis.'" *In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *6 (Tenn. Ct. App. Apr. 23, 2020) (quoting *In re Keri C.*, 384 S.W.3d 731, 748 (Tenn. Ct. App. 2010)). "[T]his Court has never imposed a bright-line rule as to what percentage of visitation must be attended in order [to] avoid categorization as token." *In re Addalyne S.*, 556 S.W.3d 774, 785 (Tenn. Ct. App. 2018). However, considering the circumstances of this case, we conclude that Mother's two abbreviated visits, totaling around three hours and both of poor quality, constituted nothing more than token visitation during the four-month period. She could have visited eight hours per month. Her two short visits were "of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C); *see, e.g.*, *In re Ellie K.*, 2020 WL 1943522, at *6 (concluding that three supervised visits and two other contacts were token visitation); *In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *7 (Tenn. Ct. App. Jan. 31, 2020) (holding that two visits were of such an infrequent nature as to merely establish minimal or insubstantial contact); *In re Quintin S.*, No. E2016-02150-COA-R3-PT, 2017 WL 2984193, at *4 (Tenn. Ct. App. July 13, 2017) (concluding that a parent who used only two hours of the sixteen allowed engaged in token visitation); *In re Kira G.*, No. E2016-01198-COA-R3-PT, 2017 WL 1395521, at *4 (Tenn. Ct. App. Apr. 18, 2017) ("the two visits Father had with Kira constituted token visitation"); *In re Colton R.*, No. E2016-00807-COA-R3-PT, 2017 WL 499439, at *10 (Tenn. Ct. App. Feb. 7, 2017) ("We have repeatedly held that two visits in the span of four months constitute no more than token visitation."); *In re Audrey S.*, 182 S.W.3d at 867 (concluding that one or two visits were "nothing more than token visitation"). Thus, we conclude that this ground for termination was sufficiently proven by clear and convincing evidence.

### b. Failure to Support

The alternative definition of abandonment alleged here occurs where the parent has "failed to support or ha[s] failed to make reasonable payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(A)(i). For purposes of this definition, "'failed to support' or 'failed to make reasonable payments toward such child's support' means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D).

Ms. Baer testified that Mother did not pay any child support or offer in-kind support during the four-month period. She explained that the parents had never offered support but brought a few little toys and a few Happy Meals to some visits. The trial court found that Mother "simply failed to pay any child support." On appeal, Mother argues that she "had no ability to pay any support at all." She notes that she was living in a camper with no electricity, had no job or driver's license, received food stamps, and brought a few Happy Meals to some visits.

"If a parent is financially unable to support a child, then the failure to support is not willful." *In re Addalyne S.*, 556 S.W.3d at 787. However, Mother's attempt to argue lack of willfulness comes too late. As we noted above, "a *petitioner* is no longer required to prove the respondent in a termination proceeding acted 'willfully' in failing to visit or support his or her child[.]" *In re Archer R.*, No. M2019-01353-COA-R3-PT, 2020 WL 820973, at *5 (Tenn. Ct. App. Feb. 19, 2020) (emphasis added). Willfulness is no longer "an element of the ground." *In re Ne'Khiya M.*, No. W2019-02223-COA-R3-PT, 2020 WL 4150994, at *3 (Tenn. Ct. App. July 20, 2020). "[U]nder this version of the statute, the burden is not on [the petitioner] to prove willfulness, but on the parent to prove that their failure was not willful." *In re Michael W.*, No. E2019-00107-COA-R3-PT, 2020 WL 405473, at *5 (Tenn. Ct. App. Jan. 23, 2020); *see, e.g.*, *In re Eli H.*, No. E2019-01028-COA-R3-PT, 2020 WL 2300066, at *6 (Tenn. Ct. App. May 8, 2020) ("[L]ack of willfulness is an affirmative defense to this statutory ground and must be pled and proven by Mother[.]") "[A] parent who has arguably failed to support or maintain contact with their child in the applicable four-month period of time retains the ability to defeat a finding of abandonment by explaining that failure with evidence of their intentions, income and life circumstances." Dawn Coppock & Michael S. Jennings, *Tennessee's New Adoption Law*, 54 Tenn. B.J. 16, 17 (July 2018).

Here, Mother did not file an answer raising the lack of willfulness as an affirmative defense, she did not testify at trial, and she did not call any witnesses or introduce any exhibits. Her attorney waived opening statements, and his one-sentence closing argument simply stated that "we don't think any of the grounds for termination have been proven," or the best interest prong.[5] The trial court noted in its written order that "[n]either Mother nor Father offered proof as to why they were unable to pay any support or why their lack of support was not willful[.]" The guardian ad litem argues that Mother should not be permitted to raise the defense of lack of willfulness "at this late date" when it was not raised in an answer or tried by consent in the trial court. We agree. Under the current version of the statute, Mother has waived her right to assert a lack of willfulness. *See In re Imerald W.*, 2020 WL 504991, at *4 n.5 ("[B]ecause the record contains no pleading by Mother that raises lack of willfulness as an affirmative defense, and because Mother raised no such defense at trial, we conclude that Mother waived this issue."); *In re Daniel B., Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (rejecting a homeless mother's argument that reversal was required where the trial court did not find that her failure to support was willful and she argued on appeal that she had no ability to pay, as lack of willfulness is now an affirmative defense and the burden fell on the mother to prove that her failure to support was not willful). Therefore, we affirm this ground for termination of Mother's parental rights.

---

[5] During closing argument, the guardian ad litem noted the amendment to the statute and stated that the burden was on the parents to show why they had not made any attempt to support the children. He noted that neither parent "attempted to do that" in this case and said that this ground was essentially "uncontested." Mother's counsel did not dispute this during his closing argument.

## 2. Substantial Noncompliance

The next ground for termination alleged by the guardian ad litem and found by the trial court was substantial noncompliance. Permanency plans are "'meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care.'" *In re Kambri P.*, No. M2019-01352-COA-R3-PT, 2020 WL 2991793, at *8 (Tenn. Ct. App. June 4, 2020) (quoting *In re C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006)). "'This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.'" *Id.* (quoting *In re C.S., Jr.*, 2006 WL 2644371, at *10). Thus, the parental termination statute provides that one ground for termination exists if "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2).

Here, the statement of responsibilities in the permanency plan required Mother to obtain housing with utilities; apply at the local housing authority and other low-income apartments in the area; participate in "home maker services" to learn how to keep a home clean and organized and safe for the children; obtain a reliable means of transportation; participate in an alcohol and drug assessment and follow all recommendations; pass random drug screens and also pill counts if prescribed medications; "make good peer choices" and avoid persons using or selling illegal substances; resolve their current legal charges and refrain from incurring any additional legal charges; comply with all rules of her probation; complete a mental health intake and follow its recommendations; and attend therapeutic visitation with the children regularly to maintain their bond with them. The revised plan added family violence services to the requirements.

In analyzing this ground for termination, we must first find that the permanency plan requirements were reasonable and related to remedying the conditions that necessitated foster care placement. *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002). Considering Mother's issues with drug addiction, mental health, criminal behavior, domestic violence, and lack of stable housing, transportation, and income, we conclude that the permanency plan requirements were reasonable and related to the conditions necessitating foster care.

Next, we must consider whether Mother's noncompliance with the plans was substantial. "[N]oncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial." *In re Valentine*, 79 S.W.3d at 548. Not every failure to comply with a permanency plan will constitute grounds for termination of parental rights. *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *14 (Tenn. Ct. App. Sept. 14, 2012). "Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to

- 14 -

determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537. "In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548.

When analyzing this ground, "[o]ur concern is with the parent's *efforts* to comply with the plan, not the achievement of the plan's desired outcomes." *In re Daniel B., Jr.*, 2020 WL 3955703, at *5 (citing *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009)) (emphasis added). Stated differently, "'outcome achievement is not the measure of compliance.'" *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *6 (Tenn. Ct. App. July 28, 2017) (quoting *In re B.D.*, 2009 WL 528922, at *11). At the same time, however, merely "'going through the motions' does not constitute substantial compliance." *In re Carrington H.*, 483 S.W.3d at 537.

By the time of trial, Mother still had not obtained stable housing with utilities. When Ms. Baer last met with Mother, she was still residing in the camper with Father and planning to move it to a campground. The parents had searched for apartments but to no avail. Ms. Baer testified that "home maker services" had been authorized for over a year but that Mother still had not completed the service. She said Mother engaged for about a month and then participated sporadically "here and there," wanting "very little" to do with the service. Similarly, Mother attended a few sessions of family violence services but was only receptive to it for a short time. Mother did complete an alcohol and drug assessment by phone not long after the children entered foster care, and she completed a thirty-day inpatient rehabilitation program. However, she refused to go to the recommended halfway house and relapsed almost immediately. Mother did not follow her alternative discharge plan either and flatly refused to return for any more residential treatment despite numerous attempts by Ms. Baer to persuade Mother to go. Mother continued to test positive for meth and admitted that she could not stop using it. She and Father also admitted that their acquaintances in Hickman County led them to continue using drugs, but they refused to go to a transitional living facility to escape their environment. Mother violated her probation in August 2019. Mother had a mental health intake but did not follow up with counseling. She only attended one appointment and filled her prescription for one month. Ms. Baer testified that she offered to drive Mother to her appointments if she had problems with transportation but that Mother always had an excuse as to why she could not attend. Finally, Mother never exercised the eight hours of visitation she was allowed per month throughout the time the children were in foster care, and she did not act appropriately when she did visit.

The evidence supports the trial court's conclusion that even though Mother made some initial efforts toward completing the plan, overall, she failed to substantially comply with the permanency plan despite "extraordinary" and "extensive" assistance from Ms.

- 15 -

Baer.[6]  The trial court found that Mother came "nowhere near close to meeting DCS halfway."  We agree.  Considering the extent of Mother's efforts to comply with the permanency plan, we likewise conclude that her noncompliance was substantial.  This ground for termination was proven by clear and convincing evidence.

### 3.  Persistent Conditions

We now turn to the ground of persistent conditions.  This ground applies when:

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3).  Each element must be proven by clear and convincing evidence.  *In re Valentine*, 79 S.W.3d at 550.

As the first part of the statutory language makes clear, this ground only applies if the children have been "removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months *by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child*."  Tenn. Code Ann. § 36-1-113(g)(3)(A) (emphasis added).  The necessary order of removal is "the threshold consideration" for this ground.  *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015).  "[I]n examining whether the ground of persistence of conditions has been established, we begin by examining the order or orders that removed [the child] from [the parent]."  *In re Ryder R.*, No. M2015-02461-COA-R3-PT, 2016 WL 4199567, at *6 (Tenn. Ct. App. Aug. 5, 2016); *see In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *12 (Tenn. Ct. App. June 17, 2015) (considering the sufficiency of

---

[6] The trial court described Ms. Baer as a "gifted caseworker."  We also commend Ms. Baer for her extraordinary efforts in this case.

the removal order although it was not raised as an issue by either party on appeal).

Here, the only juvenile court order that was introduced as an exhibit at trial was a final order of adjudication and disposition adjudicating the children dependent and neglected in October 2018. According to that final order, the original petition was filed on August 24, 2018. However, the petition is not in the record on appeal. The order removing the children from the home or custody of the parents does not appear in the record either. However, the initial permanency plan and Ms. Baer's notes both state that the children had been removed from the parents and placed with relatives for a short time, and then the children "came into [DCS] custody" on August 23, 2018. Ms. Baer testified that "there was an IPA put in place and [the children] were with [relatives] briefly."

On appeal, Mother argues that this ground for termination should be reversed because it is not clear from the record that the children were removed from her home by court order. In its discussion of this ground, the trial court's order simply states that "[t]he children were removed from their parents' care by a court order in August of 2018." Earlier in the order, the trial court found:

> These children were removed from the parents' custody on August 23, 2018, based upon the children's exposure to the parents' drug use, domestic violence between the parents, lack of supervision of the children, mental health issues, and environmental neglect. The children were placed in protective custody by a court order.

However, we find no evidence in the record to show that this did in fact occur as described.

DCS argues that because Ms. Baer mentioned an "IPA," we should conclude that legal custody of the children remained with Mother throughout the relative placement and that it was not removed prior to the dependency and neglect proceeding. DCS would have us further presume that the requisite order removing the children from Mother's legal custody was entered at some point during the dependency and neglect proceeding. This we cannot do. We rejected a similar argument in *State Dep't of Children's Servs. v. D.W.J.*, No. E2004-02586-COA-R3-PT, 2005 WL 1528367, at *4 (Tenn. Ct. App. June 29, 2005), where we explained that in order to prove the ground of persistent conditions, the petitioner "was first required to prove that the children had been removed from Mother's home pursuant to a court order for a period of six months." We explained that "[t]he submission into evidence of a certified copy of the court order which removed the children from Mother's home would have been sufficient proof," but no such order was admitted. *Id.* We had "no doubt that such an order existed" and recognized that there were "passing references in the transcript to the children being removed from Mother's home and being in the custody of DCS." *Id.* Still, "this [did] not amount to clear and convincing proof" of the requisite court order. *Id.* We added, "We can not assume the existence of facts that are not in the record. Having an adequate record on appeal is crucial in any case, but it is

particularly essential in a termination case where we are asked to review the decision of a trial court that forever severs the legal bond between Mother and her [] children." *Id*; *see also In re Dylan S.*, No. E2018-02036-COA-R3-PT, 2019 WL 5431878, at *7 (Tenn. Ct. App. Oct. 23, 2019) (reversing this ground due to the absence of the necessary order in the record); *In re R.L.M.*, No. E2013-02723-COA-R3-PT, 2015 WL 389635, at *3 (Tenn. Ct. App. Jan. 29, 2015) (explaining that "the mere suggestion or possibility of" the necessary order was "not good enough").

Assumptions and surmises do not meet the clear and convincing standard. *In re Michael O.*, No. W2017-01412-COA-R3-PT, 2018 WL 576777, at *8 (Tenn. Ct. App. Jan. 26, 2018). Based on the limited record before us, we are simply unable to determine, by clear and convincing evidence, whether the children were removed from Mother's home or custody "by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child." Tenn. Code Ann. § 36-1-113(g)(3)(A). We reverse this ground for termination.

### 4. Failure to Manifest

The final ground we must address is a relatively new addition to the termination statute. It applies when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). Initially, there was a "split in authority" as to how the first element was proven. *See In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9 (Tenn. Ct. App. Oct. 29, 2018). "In *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), a panel of this Court concluded that the first prong of the statute requires the petitioner to prove both an inability *and* an unwillingness of the parent to assume custody or financial responsibility for the child." *Id.* Because the parents at issue *wanted* custody, this negated a required element of the ground. *In re Ayden S.*, 2018 WL 2447044, at *7.

Another panel of this Court respectfully disagreed with that approach in *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018), holding, instead, that

> [T]he first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical

- 18 -

custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child.

Meaning, "the parent must have 'manifest[ed], by act or omission, an ability and willingness.'" *Id.* at *13 (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

Recently, members of this panel have endorsed the latter approach adopted in *In re Amynn K. See, e.g.*, *In re Nakayia S.*, No. M2019-00644-COA-R3-PT, 2020 WL 4558376, at *7 (Tenn. Ct. App. Aug. 7, 2020) ("[W]e will consider whether DCS proved by clear and convincing evidence that Father failed to manifest an ability to assume custody of the Children **or** failed to manifest a willingness to assume custody of the Children."); *In re Nevaeh B.*, No. E2019-01539-COA-R3-PT, 2020 WL 1527001, at *7-8 (Tenn. Ct. App. Mar. 31, 2020) (applying *In re Amynn K.*); *In re H.S.*, M2019-00808-COA-R3-PT, 2020 WL 1428777, 2020 WL 1428777, at *10 (Tenn. Ct. App. March 3, 2020) ("After careful consideration of the conflicting authorities, we accept DCS's invitation to follow the holding of *In re Amynn K.*"); *In re Jayda H.*, No. E2019-00855-COA-R3-PT, 2019 WL 6320503, at *9 (Tenn. Ct. App. Nov. 25, 2019) ("[C]onsistent with the discussion in the *In re Amynn K.* decision, we do not view a parent's demonstration of 'willingness' as fatal to this ground when accompanied by a failure to manifest the requisite 'ability.'"); *but see In re Neveah M.*, No. M2019-00313-COA-R3-PT, 2020 WL 1042502, at *16 (Tenn. Ct. App. Mar. 4, 2020) (following *In re Ayden S.* with one judge concurring in results only) *perm. app. granted* (Tenn. June 15, 2020).

We also find guidance in our supreme court's decision in *In re Bernard T.*, 319 S.W.3d 586, 604 (Tenn. 2010), wherein the Court considered a similar ground for termination, applicable to putative fathers, which applies when "[t]he person has failed to manifest an ability and willingness to assume legal and physical custody of the child[.]" Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv). The Court affirmed termination under this ground where the father had "manifested a commendable willingness to assume legal custody of all the children" but "conceded that he was unable to support the children financially and that he could not provide them with a stable residence." *Id.* According to the Court, "This testimony alone provide[d] clear and convincing evidence that [the father] [did] not presently have the ability to assume legal and physical custody of any of the children." *Id.* at 604-05. *See also In re Braelyn S.*, 2020 WL 4200088, at *17 (examining the legislative history of the statute and concluding that it clearly supported "the *Amynn K.* interpretation" of section 36-1-113(g)(14)).

Applying the interpretation in *In re Amynn K.*, DCS was required to prove that Mother "failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child." 2018 WL 3058280, at *14. Here, the trial court found that Mother had "simply not shown an ability and willingness to personally assume responsibility of [her] children."

- 19 -

The trial court added, "Whatever the reason or excuse, Mother [is] unable and unwilling to commit to getting clean[.]" The record supports the trial court's conclusions.

When considering whether the parent has demonstrated an *ability*, "we focus on 'the parent's lifestyle and circumstances.'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). For *willingness*, "we look for more than mere words" and consider whether the parent attempted to overcome the obstacles that prevented him or her from assuming custody or financial responsibility for the child. *Id.* "A lack of effort can undercut a claim of willingness." *Id.* Mother has manifested an inability to assume custody of the children due to her unresolved issues with drug addiction, mental health problems, domestic violence, and lack of suitable housing. She has demonstrated an unwillingness to assume custody by failing to take the steps necessary to address those issues. Mother repeatedly refused to enter a transitional living facility or domestic violence shelter and would not return to residential rehabilitation because she did not want to be separated from Father. Perhaps the most striking evidence of her unwillingness was her refusal to get out of bed to attend the last child and family team meeting when her caseworker stood outside the camper begging her to go. Clear and convincing evidence supports the trial court's conclusions regarding this element.

The same concerns also demonstrate the existence of the second element. Mother's unresolved issues with drugs, mental health, domestic violence, and housing present to the children "'a real hazard or danger that is not minor, trivial, or insignificant.'" *In re Braelyn S.*, 2020 WL 4200088, at *17 (quoting *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018)). This harm is "'sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not,'" and it is "'more than a theoretical possibility.'" *Id.* (quoting *In re Maya R.*, 2018 WL 1629930, at *8). This element was also sufficiently met, and therefore we conclude that this ground for termination was also proven.

### B.    *Best Interest*

If at least one ground for termination has been proven by sufficient evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). Tennessee Code Annotated section 36-1-113(i) lists nine statutory factors for consideration:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment

after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

We must bear in mind that the child's best interest is viewed from the child's perspective rather than the parent's perspective. *In re Gabriella D.*, 531 S.W.3d at 681. "'[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.'" *Id.* (quoting Tenn. Code Ann. § 36-1-101(d)).

Applying the statutory factors, we conclude that Mother has not adjusted her circumstances to make it safe and in the best interest of the children to be in her home. By the time of trial, the children had been residing in their foster home for approximately fifteen months. Shortly before trial, Mother was still residing in the small camper and planning to move it to a campground. To Ms. Baer's knowledge, it did not have electricity or running water. The windows and door had been broken by intruders, and it was padlocked with a chain to keep people out. The parents continued to abuse drugs and had not addressed their domestic violence issues. *See* Tenn. Code Ann. § 36-1-113(i)(1), (7). Ms. Baer went above and beyond in her efforts to assist Mother, yet Mother failed to effect any lasting adjustments. *See* Tenn. Code Ann. § 36-1-113(i)(2). Mother did not maintain regular visitation with the children, and it was eventually suspended due to her attendance at visits under the influence of meth. She had not visited or called the children in several months. *See* Tenn. Code Ann. § 36-1-113(i)(3). We agree with the trial court's conclusion

that a meaningful relationship does not exist between Mother and the children. The foster mother testified that the children no longer ask about Mother. *See* Tenn. Code Ann. § 36-1-113(i)(4).

A change of caretakers and physical environment at this point would likely have a detrimental effect on the children's wellbeing. As previously noted, the children entered custody covered in bug bites and head lice, and their belongings were covered in rat feces and urine. The youngest was almost eleven months old and did not crawl, walk, or communicate verbally, the two-year-old was aggressive and "cussed a lot," and the five-year-old could not identify any letters, numbers, or colors. The children were thriving in their current foster home. They considered the two biological children in the home to be their siblings and referred to the foster mother as "mom." The oldest child was still struggling with anger issues but was attending therapy several times per week. She had asked the foster mother to adopt her. *See* Tenn. Code Ann. § 36-1-113(i)(5).

The children had been adjudicated dependent and neglected, and the risk of neglect and domestic violence in the home remained. *See* Tenn. Code Ann. § 36-1-113(i)(6). Mother's drug addiction rendered her consistently unable to care for the children in a safe and stable manner. *See* Tenn. Code Ann. § 36-1-113(i)(7). Mother admitted having unresolved mental health issues but refused to go to her appointments. *See* Tenn. Code Ann. § 36-1-113(i)(8). And finally, Mother did not pay child support or send in-kind support for the children aside from occasional Happy Meals and toys during visits. *See* Tenn. Code Ann. § 36-1-113(i)(9).

This evidence clearly and convincingly establishes that termination of Mother's parental rights is in the best interest of the children.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is hereby reversed in part and affirmed in part and remanded for further proceedings. Costs of this appeal are taxed to Mother, Katelyn C., for which execution may issue if necessary.

_____

CARMA DENNIS MCGEE, JUDGE